# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA** : 3:CR-20-108

**v.** : (JUDGE MANNION)

**ANTHONY QUAMAINE BROWN,** :

**Defendant** :

# M E M O R A N D U M

Presently before the court is the Motion to Suppress Wiretap Evidence, (Doc. 337), filed by defendant Anthony Quamaine Brown, a/k/a "BX", through his counsel. Brown, who was charged in a second superseding indictment, (Doc. 392), with one count of conspiracy to distribute controlled substances, i.e., heroin, cocaine, fentanyl, cocaine base ("crack"), and tramadol, Count 1, in violation of 21 U.S.C. §841(a)(1), §841(b)(1)(A) and (B), moved to suppress wiretap evidence. Specifically, Brown moved to suppress intercepted wire and electronic communications he made that were obtained from co-defendant Robert Thompson's AT&T cellular telephone. Brown claims that the government unlawfully intercepted his wire and electronic communications over the stated target cellular phone in violation of the Federal Wiretap Statute, Title 18, U.S.C. Section 2158, *et. seq*., and the Fourth Amendment, and that all of the evidence obtained from the wiretaps should be suppressed.

Brown's pending motion has been fully briefed, and it is now ripe for disposition.

Based on the following, defendant Brown's motion to suppress will be **DENIED IN ITS ENTIRETY**, without the necessity of conducting an evidentiary hearing.[1]


## I.     FACTUAL AND PROCEDURAL HISTORY[2]

Brown has three remaining co-defendants in this case who are scheduled to jointly go to trial August 16, 2021, namely, Tysheen Gott, Robert Thompson, and Damien Navarro.

According to the government, (Doc. 407 at 3-4), the following occurred as a backdrop to Brown's motion to suppress:

On February 28, 2020, [allegedly] upon presentation of the fruits of the ongoing investigation, th[is] Court approved a thirty-day wiretap for electronic interception over "Gott Target Phone 1." [*See* 3:20-mc-159, Doc. 3, Filed Under Seal]. Interception of electronic communications over "Gott Target Phone 1" commenced on February 28, 2020 and was sealed on April 1, 2020. [That is, this court granted the government 30-days authorization to

---

[1]Brown also has three other pre-trial motions pending, all filed on April 9, 2021, namely, his motion for severance pursuant to Fed.R.Crim.P. 14, (Doc. 339), his motion to compel discovery, (Doc. 342), and his motion for disclosure pursuant to FRE 404(b) and 609, (Doc. 344). These motions will be decided by separate Memoranda prior to the July 19, 2021 final pre-trial conference.

[2]Since the court stated the factual background of this case in its June 2, 2021 Memorandum denying Thompson's motion to suppress wiretap evidence, it is not fully repeated herein.(*See also* Doc. 407 at 1-4).

intercept wire and electronic communications regarding Sprint wireless cellular telephone (570) 235-0591 belonging to Gott.]

On March 18, 2020, th[is] Court authorized a thirty-day wiretap for wire and electronic communications over "Gott Target Phone 2." (*See* Misc. No. 20-159-11 [3:20-mc-159, Doc. 11], Filed Under Seal). Interception of wire and electronic communications over "Gott Target Phone 2" commenced on March 18, 2020 and was sealed on April 22, 2020. [That is, this court granted the government 30-days authorization to intercept wire and electronic communications regarding Sprint wireless cellular telephone (570) 235-8250 belonging to Gott.]

On April 7, 2020, th[is] Court authorized a thirty-day wiretap for wire and electronic communications on a cellular device utilized by Robert Thompson and identified as "Thompson Target Phone 1." Interception of wire and electronic communications over "Thompson Target Phone 1" commenced on April 7, 2020 and was set to terminate on May 6, 2020. (*See* Misc. No. 20-159-23, [3:20-mc-159, Doc. 23], Filed Under Seal). On May 6, 2020, th[is] Court authorized a thirty-day extension to continue the interception of wire and electronic communications over "Thompson Target Phone 1," which was set to terminate on June 4, 2020. [That is, this court granted the government 30-days authorization to intercept wire and electronic communications regarding AT&T wireless cellular telephone (862) 867-9840 belonging to Thompson.][3]

Brown, (Doc. 351 at 3), states that "in the [May 29, 2020] master affidavit [of probable cause] for search warrant [of TFO Shane Yelland], the government made reference to calls and texts it asserts are between [Brown] and [Thompson]", and that these exchanges were on April 8 through 11, 2020. Brown states that in the master affidavit, Yelland claimed that he was only linked to McPhillips and

---

[3]The court notes that Brown's recitation of the facts in his brief, (Doc. 351 at 2-4), are substantially the same as the above facts recited by the government in its opposition brief regarding this court's authorizations for the wiretaps on Thompson's cell phone and Gott's cell phones. *See also* 3:20-mc-159.

Thompson, and that the affidavit was filed after the government had obtained the Orders from this court to allow the wiretaps for "Gott Target Phones 1 & 2" and "Thompson Target Phone 1." Brown states that the first Order authorizing the wiretap for "Thompson Target Phone 1" was dated April 7, 2020. Brown then claims that Yelland stated in his master affidavit that he did not discover Brown's alleged involvement in the case until April 4, 2020, through an interview with CW#2 and the references made to "Anthony", and that this was only three days before this court's Order authorizing the wiretap for "Thompson Target Phone 1." (*See* search warrant master affidavit, 3:20-mc-312, Doc. 12 at 55). However, Brown contends that "by the government's own assertion, it identified [him] before the April 4, 2020 interview with CW#2." (Doc. 351 at 3).

Brown also contends that according to Yelland's averments in his master affidavit, wire and electronic communications over "Thompson Target Phone 1" began on March 28, 2020, i.e., before this court's Order authorizing the wiretap. (Doc. 351 at 4).

Brown thus contends that the wiretap of "Thompson Target Phone 1" began on March 28, 2020, and that is why agents had already identified him before the interview with CW#2, and he contends that the interception of his alleged inculpatory communications with Thompson was unlawful since this court did not issue the Order authorizing the interception of Thompson's cellular phone until

April 7, 2020. Specifically, Brown states that "[t]he commencement date of March 28, 2020 is outside of the date of the Court's Order for wiretap of ["Thompson Target Phone 1"] and constituted a search without a warrant that involved the phone communication and privacy interest of [himself]."

For support, Brown cites to the application for a search warrant submitted in this case on May 29, 2020, and the master affidavit signed by FBI Task Force Officer ("TFO") Shane Yelland, 20-mc-312, Doc. 12, which at Paragraph 21, Page 19, stated:

> Interception of wire and electronic communications over THOMPSON's "Target Phone 1" **commenced on March 28, 2020**, and was set to terminate on May 6, 2020; however, on May 6, 2020, the Court granted a 30 day extension to continue the interception of wire and electronic communications over ROBERT THOMPSON's "Target Phone 1" set to terminate on June 4, 2020.

(Doc. 351 at 4) (emphasis added).

Thus, Brown seeks to suppress all the of his intercepted communications with Thompson over "Thompson Target Phone 1" since he contends the interceptions began prior to this court's authorization in violation of the Title III of the Wiretap Act, 18 U.S.C. §2510, *et seq*., and the 4th Amendment. As proof to show that the government unlawfully intercepted communications over "Thompson Target Phone 1" Brown asserts that even though the interview with CW#2 in which he was allegedly first mentioned occurred on April 4, 2020, the government had already identified him before this interview seemingly based on illegal interceptions

5

of his communications with Thompson obtained before this court's April 7, 2020 authorization Order. (*See* 3:20-mc-159, Doc. 23).

Against the above stated backdrop, Brown filed his motion to suppress and brief in support on April 9 and 10, 2021. (Docs. 337 & 351). In addition to claiming that the government prematurely began intercepting communications regarding "Thompson Target Phone 1" which implicated him prior to the court's authorization, Brown also claims that the affidavits of probable cause in support of the wiretap for Thompson's cell phone failed to meet the necessity requirement. After being granted an extension of time, the government filed its brief in opposition to Brown's motion to suppress on May 24, 2021, with an attached Exhibit. (Docs. 407 & 407-1). After being granted an extension of time, Brown filed his reply brief in support of his motion to suppress on June 17, 2021. (Doc. 449).

## II.    LEGAL STANDARD FOR MOTION TO SUPPRESS

The court has jurisdiction over Brown's motion to suppress under 18 U.S.C. §3231. A criminal defendant brings a pre-trial motion to suppress evidence under Federal Rule of Criminal Procedure 12(b)(3)(C), in an effort "to show that evidence against him or her was unconstitutionally obtained." U.S. v. Hernandez, 2015 WL 5123924, at *4 (M.D. Pa. 2015). Protection against unreasonable searches and seizures is enshrined in the Fourth Amendment, which states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"The Fourth Amendment, like the other Amendments contained in the Bill of Rights, imposes direct limitations on the actions that may be taken by the Federal Government." Adams v. Springmeyer, 17 F.Supp.3d 478, 490 (W.D. Pa. 2014) (citing McDonald v. City of Chicago, 561 U.S. 742, 753–55 (2010)). The Fourth Amendment's purpose is to "safeguard the privacy and security of individuals against arbitrary invasions" by the government. Camara v. Mun. Ct. of S.F., 387 U.S. 523, 528 (1967). For purposes of the Fourth Amendment, a search "occurs when an expectation of privacy that society is prepared to consider as reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113 (1984). In order to establish standing under the Fourth Amendment to challenge a search, a defendant must show a "reasonable expectation of privacy" in the place or thing searched. Rakas v. Illinois, 439 U.S. 128, 132 n.1 (1978).

"The traditional Fourth Amendment principles that apply to property searches govern probable cause determinations under the federal and/or state wiretap statutes. U.S. v. Tutis, 167 F.Supp.3d 683, 695 (D. N.J. March 8, 2016) (citing United States v. Tehfe, 722 F.2d 1114, 1118 (3d Cir. 1983); 18 U.S.C. §2518(3)

(federal wiretap statute)). "Under these principles, a finding of probable cause requires a 'fair probability' of criminal activity, based upon the totality of the circumstances." *Id*. (citations omitted). Thus, "the issuing court must 'make a practical, common-sense decision' concerning whether the circumstances set forth in the supporting affidavit, 'including the 'veracity' and 'basis of knowledge' of the persons supplying the hearsay information,' demonstrate 'a fair probability' that the authorization will result in evidence of a crime." *Id*. (citation omitted).

Further, the Supreme Court regards exclusion of evidence as an "extreme sanction" that "should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule," which center on deterring police misconduct. U.S. v. Leon, 468 U.S. 916, 918 (1984).

The Fourth Amendment also lays out four requirements of a valid search warrant. The warrant must: 1) be based on probable cause; 2) be supported by a sworn affidavit; 3) describe particularly the place of the search; and 4) describe particularly the persons or things to be seized. Groh v. Ramirez, 540 U.S. 551, 557 (2004).

"The Fourth Amendment requires that a search warrant be supported by probable cause, and '[e]vidence seized pursuant to a search warrant that is not so

supported may be suppressed.'" <u>U.S. v. Rivera</u>, 524 Fed.Appx. 821, 825 (3d Cir. 2013) (citation omitted).

Generally, "the burden of proof is on the defendant who seeks to suppress evidence." <u>U.S. v. Johnson</u>, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). "However, once the defendant has established a basis for his motion, [], the burden shifts to the government to show that the search or seizure was reasonable." *Id.* (citation omitted).

## III.    DISCUSSION

In his motion to suppress, Brown raises the following claims: (1) the government initiated interception of "Thompson Target Phone 1" on March 28, 2020, prior to the court's authorization for that phone on April 7, 2020; and (2) the wiretap affidavits for "Thompson Target Phone 1" lacked sufficient necessity statements.

The court will address Brown's claims in his motion to suppress *seriatim*.

### 1. The Government Did Not Initiate Interception of "Thompson Target Phone 1" Prior to Court Authorization

Pursuant to 18 U.S.C. §2518(10)(a)(i), an "aggrieved person ... may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that the communication was unlawfully intercepted." "A communication is unlawfully

9

intercepted if 'there is a failure to satisfy any of [the] statutory requirements that directly and substantially implement congressional intent to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." U.S. v. Romeu, 433 F.Supp.3d 631, 640 (M.D. Pa. 2020) (quoting United States v. Giordano, 416 U.S. 505, 527, 94 S.Ct. 1820 (1974)).

As his first claim, Brown argues that the government began intercepting his communications on Thompson's AT&T cell phone before the court's authorization for them. In particular, Brown argues that the government began unlawfully intercepting wire and electronic communications over "Thompson Target Phone 1" for a 10-day period commencing on March 28, 2020, before the court's Order dated April 7, 2020, in violation of the Federal Wiretap Statute. In support of his contention, Brown refers to paragraph 21 of page 19 of the search warrant affidavit of TFO Yelland undisputedly indicating that interception of "Thompson Target Phone 1" commenced on "March 28, 2020." Brown claims that his communications with Thompson were intercepted by the government before the court's April 7, 2020 authorization order "since the government [] disclosed that it had knowledge of [him] prior to April 4, 2020, and admitted that knowledge when on page 55 of the master affidavit for search warrant, [TFO] Yelland referenced that an interview with CW#2 occurred to gather knowledge of [him] who was named by the

government as Defendant Anthony Brown." (*See* search warrant master affidavit, 3:20-mc-312, Doc. 12 at 19 & 55). Specifically, Brown states that since Yelland averred in his master affidavit, "On April 4, 2020, a cooperating witness, hereafter referred to as CW#2, was interviewed regarding his/her knowledge of Anthony Brown," this is proof that agents were prematurely and unlawfully intercepting communications over "Thompson Target Phone 1" prior to the Court's April 7, 2020 Order because how would agents otherwise know his name was "Anthony Brown."

Brown further states that at no point in any application for a wiretap order was he identified by the government in any capacity, and that the knowledge about him was only obtained by the government "by wire interception on March 28, 2020 and prior to issue of [the] April 7, 2020 Order." (Doc. 351 at 5). Brown thus argues that the information about him allegedly obtained by the government before the April 7, 2020 Order constitutes a search and seizure without a warrant in violation of the 4th Amendment and that all evidence gathered against him, including the subsequent information derived by the April 7, 2020 and May 6, 2020 Orders authorizing wiretaps of Thompson's cell phone, must be suppressed.

The government recognizes the discrepancy in the May 29, 2020 master affidavit and states that this was "an obvious typographical error" contained in the search warrant affidavit and that the interception of "Thompson Target Phone 1"

on March 28, 2020, "would have been a physical and legal impossibility" without a court order. (Doc. 407 at 6-7).

The court has examined the record in this case and finds that that paragraph 21 of the search warrant master affidavit, 3:20-mc-312, Doc. 12 at 19, contains an inadvertent typographical error regarding the initiation of the interception of the communications over "Thompson Target Phone 1" on "March 28, 2020."

First, the government, (Doc. 407 at 7-8), explains the wiretap process used:

a cellular service provider cannot lawfully permit interception of wire and electronic communications without the Court's Order. Brown is in possession of the Court's Order and is aware that it was not authorized until April 7, 2020. [*See* 20-mc-159, Doc. 23] The Court's Order only begins the process. That Order must be relayed to an FBI technical squad who is then tasked with interfacing with the cellular service provider, AT&T in this case, by first providing the Court's Order to the particular cellular service provider, and then technically facilitating the electronic ability to intercept and store the communications. Likewise, the particular cellular service provider, AT&T in this case, cannot lawfully assist in that process without first receiving the Court's Order, and then technically facilitating the electronic ability to begin interception pursuant to the Court's Order.

Thus, the government contends that "Brown's argument that the FBI intercepted wire and electronic communications over "Thompson Target Phone 1" prior to the Court's April 7, 2020 Order is premised on a physical and legal impossibility", and that "[i]t would also have to be premised on AT&T being a willing accomplice of Government agents, i.e., permitting interception [of Thompson's cell phone] without a lawful court order." (Doc. 407 at 8). There is simply no evidence

of any agreement between the agents and AT&T to unlawfully begin the wiretap on Thompson's cell phone before the court issued the Order authorizing it.

In his reply brief, Brown speculates without any evidence, let alone good faith evidence in support, that since the government already had an Order authorizing wire intercepts on Gott's cell phone beginning on March 18, 2020 and ending on April 22, 2020, and admittedly intercepted communications between Gott and Thompson on this phone, the government could have used the "wire arrangements [it had] in place with the cell phone provider for [unlawful] intercepts [of Thompson's cell phone] to occur [between March 28, 2020 and April 4, 2020]." Brown also states that the government must "fully disclose its use of wire surveillance on March 28, 2020 and whether or not it extended to [] Thompson and Brown."

However, the government contends that the record (which has already been provided to Brown) shows that the reference to the March 28, 2020 date was "an obvious typographical error" since "the preceding sentence of paragraph 21 on page 19 of the search warrant affidavit correctly states that on April 7, 2020, the Court signed an Order authorizing the interception of wire and electronic communications on a cellular device utilized by Robert Thompson, a/k/a "Jeffrey Parker, for a thirty-day period." (Doc. 407 at 6 & 8) (citing master affidavit, 3:20-MC-312, Filed Under Seal, ¶21). Also, paragraph 21 of the master affidavit states that interception over "Thompson Target Phone 1" would terminate on May 6,

2020, which was the expiration of the 30-day period (obviously commencing on April 7, 2020) authorized by the Court. (*See also* Doc. 407-1, a photograph of the FBI whiteboard kept in the wire interception room showing how agents tracked the wiretap interception commencement and termination dates regarding all of the affidavits in this case, including "Thompson TP 1", which was depicted on the board as starting on "4/7").

As further proof demonstrated by the record to show that Brown's claim lacks any merit, the government, (Doc. 407 at 9), details the dates regarding when the actual interception of Thompson's cell phone occurred as well as the evidence collected from these interceptions, and explains:

> [T]here are no communications, wire or electronic, that are detailed in either the affidavit in support of continued interception over "Thompson Target Phone 1," or in the search warrant affidavit, that begin prior to April 7, 2020. Brown does not note any such communications in support of his claim. Likewise, the entirety of the wiretap evidence has been provided to all defendants and there are no intercepted communications over "Thompson Target Phone 1" that occurred prior to April 7, 2020. The first reference to any communication intercepted over "Thompson Target Phone 1" in the affidavit in support of continued interception begins on April 8, 2020 when Thompson sends a text message to Tariek Mitchell. (*See* Misc. No. 20-159, Filed Under Seal, Doc. 34 at 24). The first reference to any communication intercepted over "Thompson Target Phone 1" in the search warrant affidavit begins on April 8, 2020, when text messages are exchanged between Thompson and Gott, and Thompson and Brown. (Master Affidavit, 3:20-MC-312, Filed Under Seal, at 40, 42).

In his reply brief, (Doc. 449 at 4), for support in the record regarding his claim that from March 28, 2020 through April 7, 2020, the government was unlawfully

intercepting wire and electronic communications over "Thompson Target Phone 1", including Brown's communications, Brown cites to pages 50 and 55 of Yelland's master affidavit, 3:20-mc-312. Paragraph 30, page 50, of the master affidavit has a section entitled "Pertinent Conversations Captured on Thompson's 'Target Phone 1' between Thompson and Amanda McPhillips." On page 55 of the master affidavit, it states, in part, as follows:

> On April 4, 2020, a cooperating witness, hereafter referred to as CW#2, was interviewed regarding his/her knowledge of Anthony Brown. CW#2 has previously provided accurate and credible information that was used to secure a search warrant in an unrelated investigation. **To date**, CW#2's information has proven accurate and has been corroborated, where possible, in the following manner: (a) through record checks, including PABMV checks; (b) through surveillance; and (c) **through wire and electronic intercepts occurring over ROBERT THOMPSON'S cellular device.**

(emphasis added).

Brown basically contends that the above averment in the master affidavit shows that the government had identified him prior to the April 4, 2020 interview with CW#2 and was asking the informant about him based on information it had unlawfully obtained from Thompson's cell phone prior to the interview and was then using this unlawfully obtained information to corroborate the credibility of CW#2. Brown states that "[i]t is clear that [his] identity was established prior to April 4, 2020 and not after the April 7, 2020 Order for wire interception [on Thompson's cell phone]", and that "[i]t is also clear that investigators obtained information about

[him] on or before April 4, 2020, which led investigators to interview [CW#2] solely to obtain further information of him." Brown further suggests that the government only could have gotten his name and obtained information about him that led to the April 4, 2020 interview with CW#2 based on unlawful interceptions of communications from Thompson's cell phone which he claims began on March 28, 2020.

Brown also points out that the government does not contend that CW#2 contacted agents to volunteer information about him prior to the April 4, 2020 interview and that the agents only knew about him at this time through unlawful intercepts of Thompson's cell phone beginning on March 28, 2020.

Thus, Brown states that since the Order authorizing the interception of Thompson's cell phone was not issued until April 7, 2020, the evidence that he contends was obtained by the government before the Order and that was used during the interview with CW#2 to obtain more information about him must all be suppressed.

The court does not read the above averments on page 55 of the master affidavit as Brown reads it. Rather, Yelland states that he interviewed CW#2 on April 4, 2020, about Brown. Yelland then states that "[t]o date," the information CW#2 has provided was shown to be accurate and was corroborated, in part, through wiretap interception on "Thompson Target Phone 1." The court finds that

the phase "to date" as used by Yelland, regarding the corroborating evidence to support CW#2's reliability, refers to the date of his master affidavit, i.e., May 29, 2020, and not the date Yelland interviewed CW#2. Moreover, both Brown and Thompson, as well as all of their co-defendants, were first indicted on May 28, 2020, one day before Yelland signed under oath his master affidavit. (Doc. 1).

The government also addresses Brown's contention that "agents were prematurely and unlawfully listening to "Thompson Target Phone 1" prior to the Court's April 7, 2020 Order because how would agents otherwise know his name was 'Anthony Brown,'" and explains, (Doc. 407 at 7), that it is not possible because:

> the search warrant affidavit is dated [May 29], 2020. All of the defendants had already been identified and indicted by May 28, 2020. (*See* Doc. 1). Of course agents knew who "Anthony" was at the time the search warrant affidavit was written and sworn to [May 29], 2020. Paragraph 26 on page 23 of the search warrant affidavit [3:20-mc-312, Doc. 12 at 23-24] specifically talks about the May 28, 2020 Grand Jury return of a 12-count Indictment and the affiant names all of the defendants, including Anthony Brown. In order to have the affidavit make sense, it was necessary to let the Magistrate Judge know that agents knew who "Anthony" was because they were seeking authorization to search his residence.

Further, Yelland's master affidavit began with a summary of the investigation which began in "December 201[8]" and an overview of the alleged involvement in the wide-spread drug trafficking conspiracy of Thompson and Gott and their co-defendants, including Brown. (*See* 3:20-mc-312, Doc. 12 at 7-8; *see also* 3:20-mc-159, Docs. 22 & 34). The affidavit also stated that each and every fact that Yelland knew about the investigation was not included since the affidavit was being

submitted for the limited purpose of obtaining search warrants for various properties of some of the defendants' residences, including Brown's, and some of their vehicles. (Id. at 3-4).

As further support of his claim that agents began interceptions on "Thompson Target Phone 1" on March 28, 2020, Brown again relies upon pages 55-56 of Yelland's master affidavit, 3:20-mc-312, which references CW#2's association with Lori Possinger and indicates how Yelland also used this association to support his averment that CW#2 was reliable. However, CW#2's association with Possinger and the information which CW#2 provided agents about Brown and Possinger, which was later corroborated, was information Yelland stated was used to show CW#2 provided accurate information subsequent to the April 4, 2020 interview with CW#2, i.e., as to the date of his master affidavit, May 29, 2020.

Additionally, Brown states that the government fails to explain "why an interview was conducted on April 4, 2020 with CW#2 regarding his/her knowledge of [him] when the government asserts, that [he] wasn't identified until April 8 2020", and that the government fails to explain from where it got his name on April 4, 2020. Brown also states that he was not provided with anything in discovery from the government indicating that he was part of the investigation in this case before April 4, 2020.

The court finds that Brown incorrectly interprets the government's position as well as the master affidavit of Yelland. The government did not state that Brown was not identified until April 8, 2020, rather, it stated that: "The first reference to any communication intercepted over "Thompson Target Phone 1" in the search warrant affidavit begins on April 8, 2020, when text messages are exchanged between Thompson and Gott, and Thompson and Brown." (master affidavit, 3:20-mc-312, Doc. 12 at 40, 42). Thus, the government states that no interception of Thompson's cell phone occurred before April 8, 2020, and that this is the date of the first intercepted message between Thompson and Brown. (*See id*. at 40-50). Further, the record indicates that agents were aware that Brown was Amanda McPhillips' boyfriend and that they shared a residence in Scranton, PA, that was one of the subject properties to be searched. (*See id*. at 4, 50). McPhillips is a co-defendant in this case originally indicted on the drug trafficking conspiracy charge with Thompson and Brown on May 28, 2020.

In fact, as indicated, the evidence, including the full 101 pages of the master affidavit, which Brown was provided by the government during discovery, shows that no communications were intercepted over "Thompson Target Phone 1" until April 8, 2020. (*See e*.g., pages 40-50, 51-92 of the master affidavit).

In short, neither Brown nor Thompson produced any evidence to support their claim that "for a period of 10 days [from March 28, 2020 through April 7, 2020],

the government was unlawfully intercepting wire and electronic communications over ["Thompson Target Phone 1"] in violation of the Federal Wiretap Statute and the Fourth Amendment."

As such, the court finds no merit to Brown's first claim in his motion to suppress the intercepted communications over "Thompson Target Phone 1" based on the typographical error in the master affidavit. *See* United States v. Wallace, 2009 WL 3182903, *2 (M.D. Pa. 2009) (holding that where search warrant "contained a minor typographical error .... [that] could easily be rectified by a quick glance at the affidavit of probable cause....[,] "[t]he inadvertent [error] did not invalidate the warrant's particularity."); *see also* Doe v. Groody, 361 F.3d 232, 240 (3d Cir. 2004) ("Reliance on the affidavit [to resolve typographical errors] neither broadens nor shrinks the scope of the warrant, but merely rectifies a minor irregularity.").

Similarly, in U.S. v. Mainor, 393 Fed.Appx. 10, 14-15 (3d Cir. 2010), the Third Circuit found that even though the AUSA's application for a search warrant for authorization of electronic surveillance of defendant's cell phone inadvertently referenced an expired Authorization Order issued by the Attorney General, the district court properly denied the suppression motion. The Court, *id*. at 15, explained:

> Title 18 U.S.C. §2518(10)(a)(ii), under which [defendant] asserts his claim, permits a defendant to challenge electronically obtained evidence if "the

order of authorization or approval under which it was intercepted is insufficient on its face[.]" Despite the typographical error in the AUSA's application, we conclude that the District Court correctly denied the motion to suppress. We need not address at length whether the wiretap order violated the statute by virtue of the application's inaccurate reference to the expired Authorization Order, as "[e]very circuit to consider the question has held that §2518(10)(a)(ii) does not require suppression if the facial insufficiency of the wiretap order is no more than a technical defect." United States v. Moore, 41 F.3d 370, 374 (8th Cir. 1994). We, too, have so held. *See* United States v. Traitz, 871 F.2d 368, 378–80 (3d Cir. 1989) (where wiretap order failed to identify by name the authorizing DOJ official, finding suppression unwarranted even assuming that the order violated the statute); United States v. Acon, 513 F.2d 513, 517–19 (3d Cir. 1975) (where an appropriate DOJ official approved wiretap application in fact, but a DOJ official not authorized to approve the application signed the approval memorandum, holding violation too "technical" to require suppression). We easily conclude, therefore, that the typographical error appearing in the AUSA's application does not demand suppression.

Here, the violation of the master affidavit stating the incorrect date that the interception on "Thompson Target Phone 1" began was clearly a typographical error and a technical defect, comparable to the technical defect in Mainor, that does not require suppression of all the communications intercepted from this phone.

Thus, Brown's motion to suppress will be denied with respect to his first claim that the intercepted communications over "Thompson Target Phone 1" began before the court's Order authorizing the wiretap.

## 2. The Government's Wiretap Affidavits Submitted in Support of the Title III Intercepts for "Thompson Target Phone 1" Sufficiently Established the "Necessity" Requirement of 18 U.S.C. §2518

As this second claim, Brown argues that the affidavits supporting the original and continuing wiretap applications with respect to "Thompson Target Phone 1" fail to satisfy the necessity requirement of 18 U.S.C. §2518. Briefly, as mentioned, on April 7, 2020, this court authorized a thirty-day wiretap for "Thompson Target Phone 1." (*See* 3:20-mc-159, Doc. 23). On May 6, 2020, this court authorized a thirty-day extension to continue the interception of wire and electronic communications over "Thompson Target Phone 1." (*See id*. at Doc. 35).

Pursuant to 18 U.S.C. §2518(3), the court must determine, prior to issuing an order authorizing the interception of wire, oral, or electronic communications (i.e., a Title III wiretap), that the application establishes:

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) ... there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

"If any of the §2518(3) requirements are not met by the wiretap application, then the authorization and any surveillance pursuant to it were improper." U.S. v. Romeu, 433 F.Supp.3d 631, 640 (M.D. Pa. 2020) (internal quotations and citation omitted). "Additionally, if the surveillance is improper, then the interception is unlawful pursuant to 18 U.S.C. §2518(10)(a)(i), and the government could not use the fruits of that surveillance at trial or to further its investigation." *Id*. (internal quotations and citation omitted).

Thus, "Title III requires an applicant to show probable cause in three different contexts." *Id*. "[T]he first is that an individual has or is about to commit one of several enumerated offenses ...; the second[,] that particular communications relating to the charged offense will be obtained through the interception; and third[,] that the premises where the interception will be made are being used in connection with the charged offense." *Id*. at 640-41 (citation omitted).

No doubt that the same 4th Amendment principles applicable to a warrant for a physical search apply to an authorization for a wiretap. *See* United States v. Tehfe, 722 F.2d 1114, 1118 (3d Cir. 1983); U.S. v. Tutis, 167 F.Supp.3d 683, 695 (D. N.J. 2016) ("The traditional Fourth Amendment principles that apply to property searches govern probable cause determinations under the federal and/or state wiretap statutes."). Since these 4th Amendment principles are stated above, they shall not be repeated. Suffice to say that "the Third Circuit has held that courts

must apply a commonsense approach, based on the totality of the circumstances, to determine whether there was probable cause." Romeu, 433 F.Supp.3d at 641 (internal quotations and citation omitted). *See also* Tutis, 167 F.Supp.3d at 695 (holding that "the issuing court must make a practical, common-sense decision concerning whether the circumstances set forth in the supporting affidavit, including the veracity and basis of knowledge of the persons supplying the hearsay information, demonstrate a fair probability that the authorization will result in evidence of a crime." (internal quotations and citation omitted).

The so-called "necessity" requirement provides that "[a]n application for an intercept authorization must include a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." U.S. v. Ellis, 693 Fed.Appx. 137, 139 (3d Cir. 2017) (citing 18 U.S.C. §2518(1)(c)).

In Ellis, *id*., the Third Circuit explained the requirement that the application for a wiretap must contain a statement of necessity and the court's role in making its determination of necessity as follows:

> The applicable investigative procedures generally include, *inter alia*, (1) visual and aural surveillance, (2) general questioning or interrogation under immunity grants, (3) regular search warrants, and (4) the infiltration of conspiratorial groups by undercover agents or informants. United States v. Armocida, 515 F.2d 29, 37 (3rd Cir. 1975). They may also include using a pen register or trap-and-trace device. United States v. Killingsworth, 117 F.3d 1159, 1163 (10th Cir. 1997). The application does not have to show these other techniques could not possibly succeed. Armocida, 515 F.2d at

37. Rather, the application must describe the facts and circumstances surrounding the investigation that establish a "factual predicate" sufficient to allow the issuing court to determine such techniques will likely be unsuccessful or too dangerous. United States v. McGlory, 968 F.2d 309, 345 (3rd Cir. 1992). Section 2518(3)(c) "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn, 415 U.S. 143, 153 n.12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). An application should "be tested in a practical and commonsense fashion," and "the statutory burden on the government is not great." Armocida, 515 F.2d at 38. "[I]n determining whether this requirement has been satisfied, a court may properly take into account affirmations which are founded in part upon the experience of specially trained agents." United States v. Williams, 124 F.3d 411, 418 (3rd Cir. 1997) (quotation mark omitted).

Moreover, in cases like the instant case which involve a wide-ranging drug trafficking conspiracy and the distribution of drugs, such as heroin and fentanyl, the Third Circuit has indicated that Title III wiretaps are often sought to aid investigations into large scale conspiracies. *See* United States v. Heilman, 377 Fed.Appx. 157, 174 (3d Cir. 2010); Vento, 533 F.2d at 850 (holding that "[i]n the proper circumstances, the instrumentalities of Title III may be employed to discover the full extent of crimes and conspiracies."); Armocida, 515 F.2d at 35. As the government indicates, "[u]nlike other crimes which 'come[ ]to an end upon the capture of the criminal,' conspiracies present 'special dangers' that provide the Government with 'more leeway in its investigative methods.'" (Doc. 407 at 12) (citing United States v. Kaboni Savage, 2013 WL 1334169 (E.D. Pa.); Armocida, 515 F.2d at 38 (upholding the district court's necessity finding, and observing that "[a]lthough the Government has actual knowledge of a conspiracy and evidence

25

sufficient to prosecute one of the conspirators, it is unrealistic to require termination of an investigation before the entire scope of the narcotics distribution network is uncovered and the identity of its participants learned")).

In fact, in Ellis, 693 Fed.Appx. at 139, the Third Circuit stated that "[the] clear import [of its cases] shows that, at least where the government investigation targets a large conspiracy and the individuals whose communications will be intercepted are members of that conspiracy, the necessity requirement relates to the demonstrated or probable inadequacy or danger of other investigative techniques to achieve the specific goals pursued by the investigation at hand." (citing United States v. Bailey, 840 F.3d 99, 114-16 (3rd Cir. 2016) ("Law enforcement further determined that other, less invasive investigative techniques would also fail to reveal the full scope of the [conspiracy's] operations." "In the proper circumstances, the instrumentalities of Title III may be employed to discover the full extent of crimes and conspiracies."); Williams, 124 F.3d at 418 (stating 18 U.S.C. §2518(3)(c) is satisfied by showing, among other things, "the difficulty of penetrating an organization with a secretive nature and a propensity towards violence")).

Similar to Bailey and Ellis, id., "[both] [of the] applications in this case arose from an investigation of a large drug-trafficking conspiracy in [Northeast Pennsylvania and beyond]." Also, in this case, both of the applications regarding

"Thompson Target Phone 1" had affidavits in support of the wiretaps that included detailed statements of necessity, which included in exhaustive detail the goals of the investigation, i.e., "discovering the full scope and identification of key personnel involved in illegal drug trafficking on behalf of Robert Thompson, Tysheen Gott, and their criminal enterprise" and "obtaining admissible evidence which demonstrates beyond a reasonable doubt that Robert Thompson, Tysheen Gott, and the other target subjects and any later identified targets, committed the alleged [drug trafficking offenses]", as well as a lengthy description of "the investigative techniques that were used and/or considered for use, or failed to accomplish the goals and objectives of the investigation." (Doc. 407 at 14-15). Since these sections of the affidavits are filed in this case, (see 20-mc-159, Docs. 22 & 34), and were provided to Brown, and are detailed at length in the government's brief, (Doc. 407 at 14-20), they are not repeated herein. Suffice to say that "the Application[s] could (and did) satisfy §2518(1)(c) by showing other investigative techniques, even if used against [Thompson and Brown], were or would likely be unable to achieve the goals of the overarching investigation to which the Application[s] relate[]", Ellis, 693 Fed.Appx. at 140, such as by averring that authorization for continued intercepted communications of "Thompson Target Phone 1" "is to identify the persons who are supplying controlled substances to Thompson and to whom Thompson was supplying with controlled substance[s]."

Additionally, it was noted that "[i]nvestigators were able to identify several co-conspirators of Thompson [from the initial wiretap]," and that "investigators were unable to determine the location(s) where Thompson was storing the controlled substances that Thompson acquired and distributed to his subordinates for further distribution." Further, it was indicated that "[i]nvestigators believed more time was necessary to intercept wire and electronic communications over "Thompson Target Phone 1" in order to help identify the rest of the co-conspirators and identify stash location(s) utilized by Thompson and his criminal enterprise." (Doc. 407 at 19-20). As in Ellis, *id.*, "[t]he Application[s] explicitly base[] [their] assertions on information obtained from law enforcement involved in the investigation and interpreted in light of the training and experience of [TFO Yelland]", and "[t]his is precisely the type of information on which [the Third Circuit] cases allow the issuing court to rely." (citing United States v. Williams, 124 F.3d 411, 418 (3rd Cir. 1997)). *See also* Bailey, 840 F.3d at 114-16.

As the government states, (Doc. 407 at 20), "[a] review of the extensive affidavits demonstrates that although several other traditional investigative techniques yielded significant sources of information, the use of a wiretap was necessary to accomplish the goals of the investigation, some of which included the identification of all of the confederates involved in this drug trafficking conspiracy, and the identification of the suppliers, customers and storage locations for this drug

trafficking organization." Brown's conclusory and speculative contentions that the applications failed to specify factual predicates showing other investigative techniques were or would likely be unsuccessful if used in relation to him are not sufficient in light of the lengthy details in the affidavits explaining how the normal investigative techniques had been tried, had failed, and/or were deemed too unlikely or too dangerous to accomplish the legitimate goals of the wide-spread drug trafficking investigation. *See* Ellis, *supra*.

In his reply brief, Brown again points to alleged shortcomings in the affidavits filed in support of the wiretap applications for "Thompson Target Phone 1", (Doc. 449 at 9-11), regarding the averments that agents had not determined Thompson's residence and could not conduct physical surveillance of his house partly necessitating the wiretap. Nonetheless, as discussed, the applications for the wiretap for Thompson's cell phone had more than ample explanations of why other investigative procedures reasonably appeared to be unlikely to succeed if tried. Brown also questions how it was possible that agents investigated Gott and Navarro for ten years before applying for the wiretap on "Gott Target Phone 1", and then allegedly agents "only investigated Thompson for 11 days before applying for a wiretap for his cellphone." Brown then states that "[n]ormal investigative procedures worked quite well enough to accomplish every purpose lawfully open to [] agents and more success was possible if the government would

have investigated Thompson longer than eleven days before applying for a wiretap [for his cell phone.]" As discussed, on April 7, 2020, this Court authorized the initial thirty-day wiretap for "Thompson Target Phone 1", however the record simply does not support Brown's allegation that Thompson was only investigated for 11 days before the application was submitted for the wiretap of his cell phone. (*See* 3:20-mc-159, Doc. 22; 3:20-mc-312, Doc. 12). In fact, the affidavit of probable cause for authorization to intercept wire and electronic communications regarding "Thompson Target Phone 1" contained an abundance of information demonstrating a very thorough investigation which began in December 2018 was completed prior to applying for the wiretap. (*See* 20-mc-159, Docs. 22 through 22-5).

As such, the court finds that the government's applications for wiretaps with respect to "Thompson Target Phone 1" "contained a sufficient factual predicate to allow the issuing court to conclude other investigative techniques, even if used in relation to [Thompson and Brown], had not and likely would not uncover the full scope of the conspiracy." Ellis, 693 Fed.Appx. at 141 (citing United States v. Phillips, 959 F.2d 1187, 1190 (3rd Cir. 1992)).

Thus, the court will deny Brown's motion to suppress communications to and from "Thompson Target Phone 1" intercepted pursuant to the authorizations since

the affidavits in support of the applications met the "necessity" requirement of 18 U.S.C. §2518.

## IV.    CONCLUSION

For the aforementioned reasons, Defendant Brown's suppression motion, **(Doc. 337)**, is **DENIED IN ITS ENTIRETY**.

An appropriate Order follows.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Court**

**Dated: July 2, 2021**
**20-108-03**

31